UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

JORDAN R. WILLIAMS,

       Plaintiff,

    v.                              Case No. 2:18-cv-01045-JPS

DR. KAREN RONQUILLO-HORTON,
GLENN COON,
BROOKE SHAIKH,
BEAZLEY USA SERVICES INC.,
AND
WISCONSIN HEALTH CARE LIABILITY
INSURANCE PLAN,

       Defendants.
_____

**SECOND AMENDED COMPLAINT AND JURY DEMAND**
_____

NOW COMES Plaintiff Jordan R. Williams and as for his claims for relief against the above-named defendants, alleges and shows the Court as follows:

**INTRODUCTION**

1.    This action is brought to redress the failure to provide adequate medical care and treatment to Plaintiff Jordan R. Williams while he was jailed at the Milwaukee County Jail in June through August 2015 and those damages and injuries he suffers from now and into the foreseeable future, all in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the U.S. Constitution.

1

## JURISDICTION AND VENUE

2.  This Court has jurisdiction over the federal claims alleged in this complaint pursuant to 28 U.S.C. § 1331 and §§ 1343(a)(3) and (4).

3.  Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the events and omissions giving rise to the clams alleged in this complaint occurred.

## THE PARTIES

4.  Jordan R. Williams ("Williams") resides and is domiciled at Oshkosh Correctional Institution, 1730 West Snell Road in Oshkosh, Wisconsin.

5.  Dr. Karen Ronquillo-Horton ("Horton") was employed by Armor Correctional Health Services Inc. ("Armor") as the Medical Director of the Milwaukee County Jail ("jail") in June through August of 2015. Horton planned and created the policies and procedures for patient care at the jail.

6.  Glenn Coon ("Coon") was employed by Armor as a nurse practitioner at the jail in June through August 2015.

7.  Brooke Shaikh ("Shaikh") was employed by Armor as an advanced practice registered nurse at the jail in June through August 2015.

8.  Defendant Beazley USA Services Inc. ("Beazley") is a foreign insurance company whose address is 30 Batterson Park Road, Farmington, Connecticut 06032, who is primarily engaged in the business of insurance. At all times relevant hereto, Beazley provided insurance (Syndicates 2623/623 at Lloyd's policy number W1D8CD170201) to Armor and Armor's employees,

agents, officers and representatives, insuring against liability imposed by law arising out of negligent conduct and/or constitutional violations and further insuring the defendants against any damages they might be liable to others by virtue of the negligent conduct and/or unconstitutional violations; that said policy or policies of insurance were in full force and effect at the time of the events that are subject of this lawsuit; that in said contract(s) of insurance Beazley reserved the right settle or adjust any claims arising thereunder and to defend any lawsuits instituted by virtue of any such claims and has a direct interest in this litigation.

9. Wisconsin Health Care Liability Insurance Plan ("WHCLIP") is a domestic insurance corporation duly conducting business in the State of Wisconsin and is engaged in the business of, among other things, issuing policies of insurance within the State of Wisconsin, with a mailing address of 500 3rd Street, Suite 700, Wausau, WI 54403. Upon information and belief, prior to and including all relevant times hereto, WHCLIP issued a policy of liability insurance to Horton. By the terms of said policy, WHCLIP agreed to pay all sums for which Horton might be held legally liable for injuries or damages caused. Upon information and belief, said policy was in full force and effect during all time periods relevant hereto.

3

Case 2:18-cv-01045-JPS   Filed 02/04/19   Page 3 of 20   Document 69

## FACTS

### Milwaukee County Contracts with Armor in May of 2013

10. Pursuant to Wis. Stat. § 302.336(2), "Prisoners confined in the county jail [][] are in the legal custody of the county sheriff or other keeper of the jail. The sheriff or other keeper is legally responsible for any such prisoner's confinement; maintenance; care, including medical and hospital care. . . ."

11. Pursuant to Wis. Admin. Code § DOC 350.14(1), "The sheriff shall provide or secure necessary medical and mental health treatment and emergency dental care for inmates in custody."

12. Milwaukee County has a jail that is operated by the sheriff.

13. Armor began providing inmate medical services for inmates at the jail in May of 2013. The 2013 contract was extended through 2015.

14. The 2013-2015 contract required that Armor's services meet the standards for jails of the National Commission on Correctional Health Care ("NCCHC").

15. The 2013-2015 contract required that Armor expeditiously pursue NCCHC accreditation for the jail. Armor did not meet this contractual obligation. The jail was not accredited by the NCCHC between 2013 and 2015.

16. The 2013-2015 contract required that Armor hire and pay for an outside detention health care consultant to conduct an annual peer review of its services. Armor did not meet this contractual obligation. Armor did not hire or pay for an outside consultant to conduct an annual peer review of its services.

17. Armor created the policies and procedures and for the delivery of patient care at the jail in May 2013 through 2015.

18. The 2013-2015 contract provides that "all medical care decisions will be the sole responsibility of Armor."

19. Horton was hired by Armor to be the medical director at the jail. Horton did not report to the command staff at the jail.

**Jordan Williams' treatment in June, July and August 2015**

20. In June of 2015 Williams was a pretrial detainee at the jail.

21. On June 12, 2015 Williams was seen by Coon. Williams complained about severe rectal bleeding, abdominal pain and diarrhea. He weighed 223 pounds.

22. On June 19, 2015 Williams was seen by nurse practitioner Jason Panek ("Panek"). Williams again complained about severe rectal bleeding, abdominal pain and diarrhea. He weighed 219 pounds (a 4 pound loss from June 12).

23. On June 24, 2015 Williams was seen by nurse Brandee Michels ("Michels"). Williams complained about rectal bleeding, abdominal pain and diarrhea. He weighed 213 pounds (a 10 pound loss from June 12).

24. On July 6, 2015 Williams was seen by Horton. Williams again complained about severe rectal bleeding, abdominal pain and diarrhea. Horton arranged to have Williams evaluated by Dr. James Kwiatt ("Kwiatt") of GI Associates.

25. On July 8, 2015—a month after seeing Coon on June 12—Williams was evaluated by Kwiatt for extreme diarrhea and rectal bleeding; severe abdominal pain; and nausea and vomiting. He weighed 204 pounds (a 19 pound loss from June 12).

26. On July 10, 2015, based on testing performed, Kwiatt diagnosed Williams with severe ulcerative colitis, a chronic disease that caused inflammation and ulcers in the lining of the rectum and colon. There is no cure for ulcerative colitis unless the colon and rectum are removed in their entirety. Ulcerative colitis is characterized by alternative periods of flare-ups and remission, with treatment aimed at forcing the disease into remission and then effectively managing the disease to keep it in remission. As such, close and on-going monitoring and assessment of the disease's progression and the effectiveness of medication in maintaining remission are vital parts of treatment.

27. Observable conditions of a flare-up of the disease can include, among other things, diarrhea, often mixed with blood, an urgency to use the bathroom, abdominal pain, pain when passing stool, inflammation of the rectum, tiredness and weight loss.

28. On July 10, 2015 Kwiatt provided information to Armor and Horton as to the care and treatment of Williams' severe ulcerative colitis. The information explains that Williams was diagnosed with severe ulcerative colitis, that he needed medication, including prednisone, to manage Williams'

symptoms and that he expected to see improvement within 2 weeks. Horton reviewed the information provided by Kwiatt on July 13 and 14.

29. The information sent to Horton also explained that "[o]ccasionally, symptoms are severe enough that a person must be hospitalized. For example, a person may have severe bleeding or severe diarrhea that causes dehydration." The information noted that the following conditions are considerations for an "emergency department" visit: "bowel movements are black or have blood in them"; "blood in your vomit"; "severe abdominal pain"; "any signs of dehydration" such as "dizziness or weakness," "dry mouth, cracked lips, or severe thirst," "fast heartbeat or breathing," or "passing little to no urine."

30. On July 12, 2015 Williams was seen by nurse supervisor Frederick Porlucas ("Prolucas"). Williams had vomited and was dehydrated.

31. On July 13, 2015 Horton created the treatment plan for Williams: "1. May transfer to GP [general population] 2. Continue presdnisone taper 3. Kitchen advised on bland, low fiber, low residue diet for 2 weeks 4. For followup after 2-3 months 5. ffup with provider after 2 weeks."

32. On July 15, 2015 Williams was seen by RN Toya. Williams was complaining about rectal bleeding, abdominal pain and diarrhea.

33. On July 17, 2015 Williams was seen by nurse Angelique Rivera ("Rivera") and Porlucas. Williams had rectal bleeding, diarrhea and was unable to walk. He was not improving.

7

34. On July 18, 2015 Williams was seen by nurse Mai Bruno ("Bruno") and nurse Anaele-Dibia Victoria ("Victoria"). Williams complained about rectal bleeding, nausea, vomiting and dehydration. He was not improving. Williams requested to go to a hospital.

35. On July 19, 2015 Williams was seen by nurse supervisor Dominique Owens ("Owens"). Williams reported that he was getting worse.

36. On July 19, 2015 Williams was seen by nurse Electisa Spears ("Spears"). Williams reported about rectal bleeding. Spears spoke with Horton about Williams' continuing symptoms.

37. On July 20, 2015 Williams was seen by nurse Greg Barillari ("Barillari"). Williams reported abdominal pain and bloody bowel movements. Barillari noted Williams was "[s]itting on floor with obvious results of vomiting noted. One active episode in my presence. Very unusual consistency, gray chalky appearing." Williams was not improving.

38. On July 20, 2015 Williams was seen by nurse Deborah Dukler ("Dukler"). Dukler noted that "inmate having same complaint three times in last 12 hours." Horton was notified of Williams ongoing symptoms.

39. On July 20, 2015 Williams was seen by Shaikh. Williams reported about rectal pain, rectal bleeding, vomiting blood, loss of bowel control and dehydration. He now weighed 182 pounds (a 41 pound loss from June 12). Shaikh continued the same course of treatment.

40. On July 21, 2015 Williams was seen by nurse Haley Blum ("Blum"). Williams stated that he was getting worse. Blum noticed rectal bleeding.

41. On July 22, 2015 Williams was seen by nurse Tanisha Scales ("Scales"). Williams complained that he was getting worse, despite the fact that Dr. Kwiatt had advised that Williams should have been expecting improvement in his condition.

42. On July 22, 2015 Williams was seen by Coon. Williams again reported that he was getting worse. He now weighed 179 pounds (a 44 pound loss from June 12). Coon continued the same course of treatment.

43. On July 22, 2015 Michels spoke with Horton about Williams ongoing severe abdominal pain.

44. On July 23, 2015 Williams was seen by Porlucas. Williams reported severe abdominal pain and dehydration. Porlucas informed Horton of Williams' symptoms.

45. On July 23, 2015 Williams was seen by nurse Terenia Patnode ("Patnode"). Williams stated that he was getting worse. He again requested to go to a hospital.

46. On July 23, 2015 Williams was seen by counselor Joel De Witt ("De Witt"). Williams told De Witt that he was unable to control his bowels and had neck and back pain.

47. On July 25, 2015 Williams was seen by nurse Diana Muckler ("Muckler"). Williams told her that he was getting worse.

48. On July 25, 2015 Williams was seen by social worker Damon Camarata ("Camarata"). Camarata noted that Williams stated, "I just want Tx for this disease. . . ."

49. On July 29, 2015 Williams was seen by social worker Kristin Murphy ("Murphy"). Williams had soiled his pants, unable to control his bowels.

50. On July 30, 2015 Horton wrote an email to the Gina Strehlow ("Strehlow") (the Nursing Director) and others referring to Williams as one "of my babies" and stating that "[h]e will complain daily about his abdominal pain and bloody stools . . . he also calls for frequent medical emergencies." Horton failed to observe that Williams was getting worse, not improving, had been noted to be dehydrated and had lost more than 44 pounds since June 12, 2015.

51. On July 31, 2015 Williams was seen by Bruno. Williams reported abdominal pain, diarrhea, weight loss, fatigue, hemorrhoids and a sore throat.

52. On August 1, 2015 Williams was seen by nurse Tanya Chiapusio ("Chiapusio"). Williams reported diarrhea and again his dehydration.

53. On August 1, 2015 Williams was seen by social worker James Williams. The social worker noted that Williams reported inadequate medical treatment and asked to go to a hospital because of his medical conditions. The social worker noted that "[a] nurse just happen to be on the pod explained that she was aware of pt. medical condition and she felt he should be in the infirmary."

54. On August 2, 2015 Williams was seen by Patnode. Williams reported abdominal pain and diarrhea.

55. On August 2, 2015 Williams was seen by James Williams. The social worker noted that Williams "appeared in physical distress" and was begging for help for his medical condition and asked to be sent to a hospital. The social worker noted that he "had seen pt. yesterday and at that time pt. should have been transferred to the infirmary."

56. On August 4, 2015 Williams was seen by Michels. Michels noted that Williams "c/o abdominal pain, mouth pain, and hemorrhoid, which are not new findings."

57. On August 4, 2015 Williams seen by Camarata. Williams told Camarata, "Nobody is doing anything to help me. I shit myself multiple times a day. Nobody cares. I need to see the Dr. for my pain." Camarata spoke with RN Toya who told Camarata that Williams has "been seen by medical everyday this week & been cleared on all occasions. Pt demanding total care that is not offered in jail & that he does not meet criteria to receive."

58. On August 5, 2015 Williams was seen by Dr. Colleen Browne ("Browne"). Williams complained that he was getting worse. He weighed 151 pounds (a 72 pound loss from June 12). Browne continued the same course of treatment.

59. On August 5, 2015 Williams was seen by Murphy. Williams told Murphy, "I need medical help," and again reported abdominal pain.

60. On August 5, 2015 White told Browne that she "recommended that Pt. be moved out of the MHU [mental health unit] as his primary concern was related to feeling embarrassed due to having diarrhea in the GP common area."

61. On August 6, 2015 Williams was seen by Murphy. Murphy noted that Williams was "curled up in a ball." Williams reported abdominal pain.

62. On August 7, 2015 Williams was unable to attend his final pretrial conference because he was so sick.

63. On August 9, 2015 Lieutenant Scott Sobek ("Sobek") wrote an email to Strehlow, providing, among others:

> Today, I physically witnessed the appearance of inmate Jordan Williams #468514223, who resides in 4D-43. The last time I saw him was approximately 2 weeks ago. Since then, I can see a drastic change in his appearance. He now looks extremely gaunt and pale, and appears to have lost a lot of weight. The officers that are working in 40 have stated to me that inmate Williams is eating the food and Ensure we are providing him, but he cannot keep it inside. (he is almost passing it immediately).
>
> Inmate Williams was booked in on 7/23/14, at 180 lbs. I am not medical personnel, to me, he doesn't appear to be 180 lbs, but much less.
>
> I instructed the 40 officers to fill out a medical slip for inmate Williams and hand It in immediately.

64. Strehlow wrote the below reply email.

> Thank you for this information. I know Dr. White and Dr. Horton have been consistently discussing Mr. Williams. I have included them on this email so they are informed as well.
>
> Again, thank you for bringing your concerns to us.

Strehlow copied Horton on the reply email, which included Sobek's original email. Strehlow and Dr. Maureen White ("White") testified on February 1, 2019, that Horton and her staff of physicians and practitioners were the only ones that had the authority to send a patient to an emergency department or outside clinic.

65. The next day, on August 10, 2015 Williams was seen by Chiapusio. Chiapusio noted "[p]atient c/o abd pain. Writer attempted to explain that this was not a new onset & that this was not a medical emergency."

66. On August 10, 2015 Williams appeared in court. Williams, now unable to walk, was pushed in a wheelchair. Williams, unable to control his bowels, was wearing adult diapers.

67. On August 10, 2015 Coon sent email to Horton informing her that he spoke with Kwiatt's scheduler "About Jordan Williams' 50# weight loss over 5 weeks" and Kwiatt would like to examine Williams within the next two days.

68. On August 11, 2015 Williams was again pushed into court in a wheelchair wearing adult diapers.

69. On August 11, 2015 Williams was seen by Coon. Williams again reported that he was getting worse. Coon did not report Williams' weight. Coon continued the same course of treatment. He did not send Williams to the infirmary or Kwiatt.

70. On August 12, 2015 Williams was seen by Shaikh. Williams complained that he was getting worse. He now only weighed 143 pounds (a 80

13

pound loss since June 12). Shaikh continued the same course of treatment. She did not send Williams to the infirmary or Kwiatt.

71. On August 13, 2015 Williams was admitted to Froedtert Hospital ("Froedtert"). The admission diagnosis was ulcerative colitis with complication, anemia, malnutrition and refractory diarrhea. Williams was in such critical shape that Froedtert had to wait weeks, until Williams was strong enough, to perform surgical intervention.

72. During physical examinations at Froedtert on August 13, 2015 physicians observed that Williams had developed more boils under his arms and on his legs because he was unable to move around normally.

73. On August 17, 2015 doctors with Froedtert specifically "discussed the natural history of poorly treated [ulcerative colitis] could include complications that could need colectomy."

74. Froedtert physicians performed a laparoscopic total abdominal colectomy with an end ileostomy on September 5, 2015. This was done for toxic colitis, a complication from the untreated ulcerative colitis that Williams had developed because of inadequate care.

75. According to the operating surgeon, Williams' "left colon and up into the transverse colon were severely diseased." "There was a large ulcer down in the base of the cecum just adjacent to the ileocecal valve and then the ascending colon had grossly normal mucosa and then distal to that everything looked absolutely terrible." "There were just island of mucosa scattered about areas

where all the mucosa had melted away and there were large areas up near the splenic flexure where there was ono mucosa."

76. Williams was discharged from Froedtert on September 14, 2015.

## FIRST CLAIM FOR RELIEF
### Individual Liability Against Horton

77. Williams incorporates here all other paragraphs alleged in this complaint.

78. At all times relevant to the claims in this complaint, Horton was acting under color law and within the scope of her employment as the Medical Director of the jail and the patient provider of Williams.

79. Horton was aware that Williams was diagnosed with ulcerative colitis on July 10, 2015. Horton was aware that ulcerative colitis is a chronic disease affecting the colon and rectum, which requires continual treatment and monitoring to prevent flare-ups that cause, among other conditions, rectal bleeding, uncontrollable bowel movements, weight loss and severe pain.

80. Horton was aware that after Williams' diagnosis of ulcerative colitis on July 10, 2015 that Williams was experiencing a flare-up of his ulcerative colitis that caused him to suffer chronic and, constant, severe pain daily: without limitation to Williams' regularly complained about abdominal pain, bloody bowel movements, dehydration and weight loss.

81. Throughout July and August of 2015, Horton was alerted to Williams' serious medical needs and that he was getting worse not improving.

Despite being aware of the seriousness of Williams' severe and worsening ulcerative colitis, Horton failed to establish an effective special needs treatment plan for Williams and continued with a plan that she knew to be ineffective.

82. Horton failed to refer Williams to an outside specialist expeditiously.

83. Horton consciously disregarded worsening conditions despite knowing Dr. Kwiatt had expected improvement within two weeks.

84. Despite Kwiatt's statement that improvement should be expected within 2 weeks and that the obviousness of the downward progression of the disease, Horton neither responded to Williams' request to be sent to an emergency department nor acted to implement Kwiatt's recommendations to do so up observing the actual and deteriorating conditions that Williams presented.

85. By ignoring Williams' requests for adequate follow-up care, Horton caused a significant delay in Williams receipt of proper evaluation and care. Horton knew that her actions, or lack thereof, caused Williams to suffer ongoing and unnecessary pain. Horton's conduct depriving Williams of appropriate care manifests deliberate indifference in violation of the United States Constitution.

86. The treatment that Williams received from Froedtert provides testament that his pleas for help were warranted but ignored.

87. Horton's deliberate indifference to Williams' medical needs significantly delayed necessary follow-up care.

88. Horton's deliberate indifference to Williams' medical needs caused him emotional suffering and significant increased physical pain over the course of July and August of 2015, including, additional rectal bleeding, intestinal burning, stomach pains, embarrassment, strain in defecating, weight loss of 80 pounds, and leg and back pain impairing even his ability to walk.

89. Williams suffered disabling emotional responses, such as depressive moods, sleeplessness, fatigue, emotional breakdowns and low self-esteem, in addition to the additional physical pain. Inmates requested to move out of Williams' cell and other inmates generally stayed away from Williams because of his emotional distress and physical condition.

90. The unlawful conduct of Horton was intentional and knowing; manifested deliberate indifferent to the substantial health risks Williams faced; and caused him to suffer additional ongoing and unnecessary pain, all in violation of his constitutional rights to adequate medical care guaranteed by the United States Constitution.

## SECOND CLAIM FOR RELIEF
### Individual Liability Against Coon and Shaikh

91. Williams incorporates here all other paragraphs alleged in this complaint.

92. At all times relevant to the claims in this complaint, Coon and Shaikh were acting under color law and within the scope of their employment at the jail and patient providers of Williams.

93. Williams' ulcerative colitis is a serious medical disease that requires continual monitoring and assessment. Absent proper medical treatment, ulcerative colitis causes pain and suffering, and may result in an increased risk of colon cancer, among other serious consequences.

94. Coon and Shaikh had knowledge of the gravity of Williams' disease and were aware that it required timely, diligent and proper medical monitoring and treatment.

95. Coon and Shaikh were aware that the course of treatment they were continuing was ineffective and continued it anyways.

96. Coon and Shaikh disregarded the excessive risk to Williams health that their action and inactions posed, and as a direct and proximate result of their acts and omissions, cause William undue pain and suffering.

97. Coon and Shaikh were aware that Williams needed additional care and diagnostic treatment. They also knew that without this follow-up and treatment, Williams' course of treatment could not be adjusted appropriately.

98. Coon testified at his deposition that weight loss is a prompting factor for needing an outside specialist to address the issue. Shaikh knew that Williams had lost 41 pounds since June 12 on July 20, 2015. Coon knew that Williams had lost 44 pounds since June 12 on July 22, 2015. And yet neither took any action to send Williams to an outside specialist to address his medical needs. They did not even send Williams to the infirmary.

99. Coon called Kwiatt's office on August 10, 2015. Kwiatt's scheduler told Coon that Kwiatt wanted to see Williams by August 12. However, Coon sent the request for follow up care as "urgent," rather than as "emergency." The result was that Williams would have to wait up to seven days for approval. Williams did not see Kwiatt by August 12.

100. Coon and Shaikh knew that continuing a course of treatment that was not resulting in improvement was deliberate indifference.

101. The unlawful conduct of Coon and Shaikh was intentional and knowing; manifested deliberate indifferent to the substantial health risks Williams faced; and caused him to suffer ongoing and unnecessary pain, all in violation of his constitutional rights to adequate medical care guaranteed by the United States Constitution.

## RELIEF REQUESTED

Williams respectfully requests judgment in his favor and against each of the defendants, jointly and severally, awarding Williams:

A. Compensatory damages in an amount to be determined by a jury.

B. Punitive damages in an amount to be determined by a jury.

C. Reasonable costs and expenses, without limitation to attorneys and experts' fees under 42 U.S.C. §§ 1988(b) and (c).

D. An order awarding such other and further relief as this Court deems just and equitable.

## DEMAND FOR TRIAL BY JURY

Williams hereby demands a trial by jury pursuant to Fed.R.Civ.P. 38(b) and the Seventh Amendment to the United States Constitution.

Dated at the law offices of GINGRAS, CATES & WACHS, LLP, in Waukesha, Wisconsin, on this 4th day of February, 2019.

                                        Respectfully Submitted,
                                        GINGRAS, CATES & WACHS, LLP

                                        <u>/s/ Mark L. Thomsen</u>
                                        Mark L. Thomsen

                                        <u>/s/ William F. Sulton</u>
                                        William F. Sulton

                                        Suite 210
                                        3228 Turnberry Oak Drive
                                        Waukesha, WI 53188
                                        Phone: 414-778-0700
                                        Fax: 414-778-1770
                                        mthomsen@gcwlawyers.com
                                        wsulton@gcwlawyers.com

                                        *Attorneys for Plaintiff Jordan Williams*